# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **DORIS HESS,** ) | |
| ) | |
| Plaintiff, ) | Case No. 1:20CV00062 |
| ) | |
| v. ) | **OPINION AND ORDER** |
| ) | |
| **BUCHANAN COUNTY PUBLIC** ) | JUDGE JAMES P. JONES |
| **SERVICE AUTHORITY, ET AL.,** ) | |
| ) | |
| Defendants. ) | |

*Steven R. Minor,* ELLIOTT LAWSON & MINOR, *Bristol, Virginia, for Plaintiff; Cameron S. Bell,* PENNSTUART, *Abingdon, Virginia, for Defendants.*

The plaintiff, a woman formerly employed by a local public service authority, asserts a quid pro quo sex discrimination claim against her male supervisor and the employer. The defendants have jointly moved for summary judgment. For the reasons that follow, the motion will be granted.

The plaintiff, Doris Hess, worked for defendant Buchanan County Public Service Authority (Authority), a governmental entity,[1] as an office worker and as the clerk of the Authority's governing board. Defendant Robert Anderson is the Authority's executive director. Hess claims that the Authority is liable as an employer under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a) (Title VII).

---

[1] It appears that the Authority operates pursuant to the Virginia Water and Waste Authorities Act, Va. Code Ann. §§ 15.2-5100, et seq., as a political subdivision of the Commonwealth of Virginia.

She also asserts under 42 U.S.C. § 1983 that Anderson, acting under color of state law, violated her right against sex discrimination as guaranteed by the Fourteenth Amendment's Equal Protection Clause.²

The motion has been fully briefed and orally argued and is ripe for determination.

I.

The following facts are taken from the summary judgment record and are undisputed except where indicated.

Hess started working for the Authority in 2001. She has a high school diploma and "some college classes" but no degree. Mem. Supp. Summ. J. Ex. Hess Dep. 19, ECF No. 35-12. For over ten years her job was to take payments at the front window. *Id*. at 13. Her job thereafter was to issue daily work orders to the Authority's water meter readers, to download data from the meters into the billing system and help get the bills out. *Id*. at 23, 25. She filled in at the window and answered the phone when other office workers were out or unavailable. *Id.* at 25–26. She also dealt with new customers and with customers who had trouble with their bills. Mem. Supp. Summ. J. Ex. Anderson Dep. 21–22, ECF No. 35-14; Edwards Dep. 37, ECF No. 35-13.³

---

² Although the Amended Complaint asserted a third claim under the Americans with Disabilities Act, 42 U.S.C. §§ 12112, 12117, Hess has withdrawn that claim.

³ However, Hess testified that if a customer was facing a disconnect, the customer met jointly with her and the Executive Director. Hess Dep. 30, ECF No. 35-12.

Finally, in December of 2017, she began serving as Clerk to the Board of Directors, maintaining its minutes and preparing notices, and received a pay raise for that extra duty. Hess Dep. 55, ECF No. 35-12.

On December 11, 2018, defendant Anderson became the new Executive Director of the Authority. At the same time, there was a new Office Manager, Gale Edwards, to whom Hess reported. Anderson had been a former member of the Board and Edwards had been the Authority's bookkeeper.

For the years 2017 and 2018, before Anderson was employed, Hess' performance reviews were "very good." Anderson Dep. Exs. 13, 14, ECF No. 35-14. She had been there "a long time and had a lot of experience." Edwards Dep. 70, ECF No. 35-13. Nevertheless, Hess was unhappy at the Authority and wanted to leave because of "everything they kept piling on me," meaning that she felt she had been saddled with other tasks besides her "main job." Hess Dep. 44–45, ECF No. 35-12. She had an interview with an engineering firm and made applications at other places. *Id.* at 45. Hess told friends outside of work about her unhappiness. *Id.* While she didn't expressly tell that to her supervisor, Office Manager Gale Edwards, Edwards could tell that she was dissatisfied. Edwards Dep. 48, ECF No. 35-13.

The Authority's billing software was outdated and in July of 2019 the Board authorized the purchase of new and better software. After it was installed by the vendor, Edwards asked Hess to train on the new software with a technical

representative of the software supplier, but according to Edwards, she did not do so. Edwards Dep. 21, ECF No. 35-13. For this reason, Edwards proposed to Executive Director Anderson that Hess be transferred to another position with the Authority with the same pay and benefits.  The plan was that she would trade places with employee Joshua Horn, who was a computer operator in a different but nearby Authority building, doing a job that Hess had performed on occasion, and that her husband had done when he had worked for the Authority, namely monitoring the Authority's water lines.[4]  Hess Dep. 15, ECF No. 35-12.  According to Anderson's contemporaneous office notes, on August 28, 2019, he discussed with Edwards Hess' failure to participate in training, Mem. Supp. Summ. J. Ex. D, at 9, ECF No. 35-4, and he met with Hess to discuss that issue on August 29.  *Id.* at p. 502.

A few days later, on September 4, Anderson approved the transfer and he and Edwards met that same day with Hess.  Anderson advised Hess of the change, to be effective September 9, the day after the Labor Day holiday.  Hess said nothing at the meeting, other than that she agreed to train Joshua Horn,  Hess Dep. 49, ECF No. 35-12,  but she left work that day and never returned, *id.* at 70.

---

[4] Edwards testified in her deposition that her reasoning was that "Josh was already doing maintenance and stuff on the meter reading, and he's very good on the computer, and Doris was having issues and she was being uncooperative, so it just made sense." *Id.* at 93.  Hess testified in her deposition that she never told anyone she didn't want to train on the new system and that on the day of the training she was present but was distracted by her other duties.  Hess Dep. 33, ECF No. 35-12.

Hess submitted medical excuses on September 5, October 3, November 16, and November 20, 2019, the last indicating that she could return to work on December 16, but she did not do so. The last medical excuse was dated January 13, 2020, and stated that her date of return was "to be determined." Mem. Supp. Summ. J., Ex. H, ECF No. 35-9. Her Family and Medical Leave Act time ran out on November 28, and her sick leave on December 4. The Chairman of the Authority's Board of Directors wrote her on January 10, advising that her annual leave would be fully used as of January 14, 2020. She was told that if she did not return to work by January 15, the Authority would consider terminating her. *Id.* at Ex. I, ECF No. 35-9. Hess replied in writing that her doctor had not released her to return to work and that she was "looking into early retirement due to health reasons." *Id.* Ex. J, ECF No. 35-10. By letter dated February 11, 2020, the Authority formally terminated Hess and she applied for Social Security disability payments based upon her depression and anxiety. She was 54 years old.

In her deposition in this case, Hess testified that during her employment she had received "unwelcomed sexual attention" from Executive Director Anderson. Hess Dep. 56, ECF No. 35-12. Hess produced a note that she made to herself on Monday, March 25, 2019, stating, "Just got winked at. I guess Bob A. is making sure I'm not mad at him over Friday meeting." Mem. Opp'n Mot. Summ. J., Hess Decl.

Ex. 3, ECF No. 42-1.[5]  Hess also produced a note written July 15, 2019, in which she wrote, "Bob A. comes in & sticks out tongue at me and winks." *Id*. at 5. She wrote to herself again the next day (July 16) as follows: "Gale will not answer the phone.  Gale is letting Brittney & Cheryl go to lunch at @ same time.  I have already had 2 neck rubs this morning & a wink." *Id.* at 6.

While there are no further notes to herself on this subject, Hess Dep. 61, ECF No. 35-12, Hess testified that the first time she had received a neck and shoulder rub from Anderson, on a date she could not remember, she had "stiffened up and moved a little bit." *Id.* at 60.  She also testified that the neck rubs happened "about three times, but I don't recall the exact dates." *Id* at 62.  She testified that he had winked at her "[a] lot," but she couldn't give "an exact" or even a "general number." *Id.* at 63.  Anderson would wink at her if she looked up when he walked by her office. *Id.* He would also "stick[] out his tongue at her" as he walked by. *Id.* at 67.

In addition, Hess testified to "two breast grazings." *Id.* at 65.  She did not know the dates. *Id.*  She related as follows:

> Q    Describe to me what happened.
>
> A    I was sitting at my desk in front of my computer.  Mr. Anderson comes in, and he asked about an account.

---

[5] She earlier made a note explaining the March 22 Friday meeting, in which she wrote that Anderson had told her that there were too many "meter problems," to which she had responded that she was could not get any help. *Id.*

> I get up. I remember standing up at my desk, and he comes around and he – we're looking at the print-off of the person's account, and he reaches across me for another piece of paper, and he touched my breast – that was the second time – and he said, "I need to quit doing this." I don't know exactly what he meant by that.
>
> Q   So did he touch your breast with his hand?
>
> A   No. He grazed with his hand.
>
> Q   With the outside of his hand?
>
> A   Yes.

*Id.* She did not explain what the "second time" meant, whether twice in one event or at two different times. She didn't say anything to Anderson when the grazing happened but "stepped back." *Id.* at 66.

Finally, Hess testified that Anderson made "sexual jokes." *Id.* at 68. She said that when he saw her outside smoking, "He'd make a comment that he always smokes a cigarette after he has sex, because I smoke. He'd just make comments like that." *Id.*

Defendant Anderson denies these allegations. Anderson Dep. 77, ECF No. 35-14. In any event, Hess agrees that she never complained to anyone about these events while employed, although she testified that she had tried to call the Chairman of the Authority's Board after the meeting on September 4, about "them putting me in the computer room, about the sexual harassment, how Gale was doing," but she was uncertain if she couldn't reach him because he didn't have cell service or just

didn't answer. Hess Dep. 72, ECF No. 35-12. She testified that "[i]f I'm not mistaken, I left him a voicemail for him to – asking him to call me." *Id*. Regardless, she never connected with the Chairman. She never wrote him about these matters because she was "[t]oo upset, I guess. I didn't think about it." *Id.*

Hess testified that she did not return to her job after September 4 because of her "stress and anxiety . . . [f]rom Gale not answering the phones and the other two girls going on lunch and you having to do everybody's job" and "the pressure from Mr. Anderson. Just everything in general." *Id* at 70.[6]

II.

Title VII and the Equal Protection Clause both provide a public employee a right to be free from sex discrimination by their employer. *Wilcox v. Lyons*, 970 F.3d 452, 457–58 (4th Cir. 2020). Sex discrimination in the workplace can take the form of harassment where, "but for the employee's gender, he or she would not have been the victim" of the offensive conduct." *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 331 (4th Cir. 2011) (internal quotation marks and citation omitted). "Harassment" is a term of art in this context. *Okoli v. City of Baltimore*, 648 F.3d 216, 224 n.9 (4th Cir. 2011). While sexual harassment may take many forms, "two

---

[6] Anderson testified that the new job planned for Hess would have reduced her workload, a major cause of her dissatisfaction. Anderson Dep. 37, ECF No. 35-14. Hess has submitted copies of medical reports that indicate that she had been diagnosed with depression and anxiety prior to Anderson being hired. Hess Decl. Ex. at 10–12, ECF No. 42-1 (Progress Note by Angela H. Harrison, NP, dated Dec. 19, 2018).

basic varieties" have been identified, namely, "harassment that creates an offensive environment ('condition of work harassment') and harassment in which a supervisor demands sexual consideration in exchange for job benefits ('*quid pro quo*')." *Id.* at 225–26 (Wynn, J., concurring in part and concurring in the judgment) (citing in part *Katz v. Dole*, 709 F.2d 251, 254 (4th Cir. 1983), *abrogation on other grounds recognized by Mikels v. City of Durham,* 183 F3d 323 (4th Cir 1999)).  In the present case, the plaintiff expressly disclaims any reliance on an offensive environment theory and asserts only the quid pro quo variety.[7] An advantage to the plaintiff in a quid pro quo case is that where the alleged harasser is her supervisor, she does not have to prove under Title VII that the employer knew or should have known of the harassment. *Okali*, 648 F.3d at 222.  A disadvantage to an offensive environment theory is that the harassment must be shown to be "sufficiently severe or pervasive." *Id.* at 226.  "Simple teasing, offhand comments, and isolated incidents (unless

---

[7] As discussed at the hearing on the present motion:

    The Court:  What I'd like to know, Mr. Minor, is that solely based on a quid pro quo theory?

    Plaintiff's Attorney:  Yes, Your Honor.

    The Court:  So there – just to make sure, there is no free-standing sexual harassment claim made, correct?

    Plaintiff's Attorney: Yes, Your  Honor.

-9-

extremely serious)" do not meet this test. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted).

To satisfy a claim for quid pro quo sexual harassment, an employee must show that she was subjected to unwelcome conduct of a sexual nature based upon her sex, and that

> [t]he employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability. Further, as in typical disparate treatment cases, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.

*Okali*, 648 F.3d at 222 (internal quotation marks and citation omitted).

If a plaintiff makes a prima facie showing of these elements in opposition to summary judgment, the burden shifts to the employer to articulate a legitimate reason for the adverse employment action. If the employer satisfies its burden, the burden returns to the plaintiff to establish that the employer's proffered reason is pretextual. *McDonald Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).[8]

Earlier in this case, the defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), in part because of their contention that the plaintiff had

---

[8] The prima facie discrimination framework applies to both Title VII and § 1983 actions. *See Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985).

not sufficiently alleged the conditional arrangement of the harassment, as required by the elements of quid quo pro discrimination. I denied the motion, noting that the Amended Complaint expressly alleged that Anderson had "made plain" to Hess that "he expected [her] to go along with his sexual misconduct as a condition of her continued employment." *Hess v. Buchanan Cnty. Pub. Serv. Auth.,* No. 1:20CV00062, 2021 WL 2366120, at *4 (W.D. Va. June 9, 2021) (citing Am. Compl. ¶ 14, ECF No. 12).

In fact, as conceded by counsel for Hess, there is no evidence of any such express condition by Anderson.[9] Instead, it is now argued that based on the alleged acts of harassment occurring on July 16, 2019 (two neck rubs and a wink), and Hess being told on September 4 that she was being transferred to the new job, there is sufficient temporal proximity to show by inference quid pro quo discrimination. Implicit in such an argument, however, is evidence that it was indicated to Anderson that Hess rejected these alleged sexual advances. In her memorandum in opposition to summary judgment, Hess contends that she had "spurned [Anderson's] advances," Pl.'s Mem. Opp'n 7, ECF No. 42, but there is no evidence of any such rebuff, and

---

[9] At the hearing, counsel for Hess explained that he tried to allege "something like that" in the Complaint, but "it didn't [work out]." Meaning, I assume, that Anderson did *not* "make plain" to Hess the conditional nature of his alleged harassment as counsel hoped the evidence would show. While given a chance in her deposition, Hess clearly did not support such a claim. Hess Dep. 69, ECF No. 35-12.

none was cited on brief or at oral argument. It is implicit in Hess' testimony that she had found Anderson's conduct unwelcome, which is a necessary, but clearly subjective, element of a quid pro quo claim. "Advances are unwelcome if the plaintiff regarded them as undesirable or offensive and did not solicit or incite them." *Briggs v. Waters*, 484 F. Supp. 2d 466, 478 (E.D. Va. 2007) (citing *Lewis v. Forest Pharms., Inc.*, 217 F. Supp. 2d 638, 647 (D. Md. 2002)); *see also Rodriguez v. City of Hous.*, 250 F. Supp. 2d 691, 699 (S.D. Tex. 2003) ("'[U]nwelcome sexual harassment' is defined, in this circuit, as 'conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee.'") (citing *Jones v. Flagship Int'l*, 793 F.2d 714, 719 (5th Cir. 1986)). But there is no evidence that Hess so indicated to Anderson. No reasonable jury could find that the fact that she stiffened the first time that Anderson gave her a neck rub or that she stepped back once when the back of Anderson's hand grazed her breast should have indicated to Anderson that she was "spurn[ing]" his sexual advances. Pl.'s Mem. Opp'n 7, ECF No. 42.

The cases cited by the plaintiff do not help her. In *Llampallas v. Mini-Circuits, Lab, Inc.* 163 F.3d 1236 (11th Cir. 1998), a quid pro quo case, the harasser told the plaintiff that if she did not resume their sexual relationship, the harasser would have her fired. *Id.* at 1248. While the court indicated that an inference arises where a harasser's discriminatory animus is a causal link to any tangible adverse

employment action, it was stated in the context in which the harasser made harassment an express condition of further employment. Similarly, in *Ray v. International Paper Co.*, 909 F.3d 661 (4th Cir. 2018), also cited by the plaintiff, the victim was denied voluntary overtime after her supervisor repeatedly offered her money for sex, told her he would like to father a child with her, asked her to show him her genitals, and grabbed her thigh, all of which continued, "despite [her] repeatedly refusing his advances and asking him to stop." *Id.* at 665. The court held that on such a record, "it is impossible to separate [the supervisor's] motive for eliminating [the victim's] voluntary overtime work from [his] inappropriate conduct." *Id.* at 669.

It is true that in a quid pro quo case, the threat or promise by the supervisor does not have to be express but may be implicit. For example,

> quid pro quo harassment is clear if a manager explicitly tells his subordinate "I will fire you unless you sleep with me." However, it is much less clear whether a violation has occurred if a manager simply asks the subordinate whether she would like to have a drink after work to talk about a possible promotion and then sometime after she refuses, awards the position to another employee. It is even less clear if the manager merely invites the employee out for a drink on one or more occasions but does not suggest that he wishes to discuss work-related matters; if the manager is spurned and subsequently withholds anticipated benefits, it may set off alarm bells, but further evidence would be required before a charge of sexual harassment could be sustained.

*Nichols v. Frank*, 42 F.3d 503, 512 (9th Cir. 1994), *abrogation on other grounds recognized by Hudson v. Tahoe Crystal Bay, Inc.*, No. 98-17023, 1999 WL 669416,

at *1 (9th Cir. Aug. 27, 1999) (unpublished). In *Nichols*, the plaintiff requested a two-week leave from her supervisor, but before granting her request, the supervisor requested that she perform oral sex on him, which she did, although she testified that she did not want to do so. Immediately thereafter, the leave request was granted. In addition, on other occasions the supervisor would discuss her sick leave and attendance record with her, and immediately thereafter ask her to perform a sexual act. *Id.* at 513. Under those circumstances, the court held that there was sufficient implicit evidence of quid pro quo discrimination. *Id.*

In contrast, there is no showing here that there was a conditional component of any claimed harassment, either express or implied. In other words, I find that the plaintiff has not established a prima facie case in that she has not shown that the acceptance or rejection of the alleged harassment was an express or implied condition to a tangible job benefit or detriment.[10] Hess was not asked to do anything, nor were the alleged sexual advances by Anderson performed in connection with any discussion of work benefits or detriments. She did not ask Anderson to stop his conduct or imply that in any recognizable way.

---

[10] The defendants also contend that Hess has not shown a prima facie case because she did not receive a tangible job detriment in light of the fact that her pay and benefits remained the same and with less stress at the new position. Mem. Supp. Summ. J. 11, ECF No. 35. They also argue that even if a prima facie case had been shown, they have presented sufficient evidence that the transfer was for non-discriminatory reasons. *Id.* at 12–13. It is not necessary for me to reach these arguments.

III.

For the foregoing reasons, it is **ORDERED** that the defendants' Motion for Summary Judgment, ECF No. 34, is GRANTED. A separate judgment will be entered herewith.

    ENTER: April 27, 2022

    /s/  JAMES P. JONES
    Senior United States District Judge